May it please the Court. My name is Benjamin Coffin. I'm here on behalf of the City of Santa Ana's Defendant and Appellant. I'd like to reserve five minutes for rebuttals. Your Honor, this case involves the question of whether a police power regulation which the trial court found to be valid can constitute a severe impairment of a unilaterally drafted franchise where that franchise includes a provision which states that the franchise order, the City of Santa Ana, expressly reserves its right to adopt future police power regulations. In this case, the trial court found that the mere implication that no franchisee would enter into a franchise reserving such power to the government created a belief that this must be a violation of the contract clause because no franchisee would subject itself to such a limitation. The City's position is that this reservation exists. It has existed many, many years before the 1937 adoption of the franchise. The Supreme Court case law goes back actually to Fletcher v. Peck on this issue and it's cited extensively in the City's papers. The Supreme Court has said as recently in the United States Trust Company case which is cited extensively by the gas company that the government has a reserved power to adopt police power regulations. The power to act for the public good and that reserved power cannot be contracted away. There are, of course, exceptions, but in looking at the cases where the court has found since in what we call the post-Lochner era has found these exceptions. I knew Lochner was going to get into this. I'm afraid that's actually wrong. While the trial court did expressly state it was not looking at any pre-deal cases, pre-new deal cases, the trial court's actual holding which is that any police power regulation, even valid, because they found this to be valid for purposes of the court's decision, which imposes a financial burden on the franchisee is a per se violation of the contract clause. I would assert that's not much different than Lochner. That is the ruling of Lochner. I understand your point as to the breadth of that holding, but going the other way, I mean do you think that the city had an unfettered right to impose, let's say, a fee of $100,000 before every time the gas company dug up the ground? Or a million dollars? I think, Your Honor, there are extensive limitations that prevent cities from doing what you just pointed out. And this is not a process where the city woke up one morning and said, let's adopt a fee. This was, and it's uncontroverted, this was a ten-year process of not only the city of Santa Ana, but other cities throughout California, throughout the western United States, to look into this issue. This was a two-year process during that ten years where there were regular face-to-face meetings with utilities, with the great people that would have to pay this fee, including the gas company, and they attended all those meetings. It's uncontroverted in the record. And that there was a report by a Ph.D. and reliance on that report prepared for the city and many other reports that set what this fee was, that looked exactly what is the additional cost borne by the public for the loss of the effective life of a street done by trenching, and particularly by multiple trenching in the same street, and what is the additional cost to the city in having to repay the street which has been trenched or multiple. Why did it take this, which I found interesting, this argument, why did it take the city some 30 or 40 years and a Ph.D. in a study to determine that if you cut trenches in the roads, that it's going to undermine the stability or the life of the road over a period of time? I mean, it doesn't take, does that take a Ph.D. to determine that? In 30 years, when they knew at the time they adopted this ordinance that there was going to be damage caused to the road, they provided for a clause in the ordinance to allow them to assess damages? I find that difficult, that argument difficult to understand. I would repeat something that a professor once said to me. He said that civil engineering is science, but dirt is an art. We're talking about here the strength of dirt, because the trench is below. The weakness here is below the surface. It's in the dirt that it's cut into. And there are many gradual changes. It undermines the stability of the dirt or the earth underneath. Yes, the dirt is also pressed down before the asphalt is put in, and you cut a trench into the dirt. Well, the city seemed to be aware that there was going to be a problem with the trenching. Well, the city, the press. The city specifically provided for a clause in the ordinance to allow for, or in the franchise agreement, to allow for an assessment of damages to repair. Well, Your Honor, there's two kinds of damage that we're talking about here, and the two cannot be confused or crossed. In one case, there is a problem in patching the trench. You have a seam in the road that is patched. If that patch is not well done, water can go through the patch. That was what was the state of the art in 1937. Do a good patch and keep that patch from leaking, and we will come out and inspect that patch and walk up and down the street and look at that patch and see if that's a good patch. And if we find it's not a good patch, we'll tell you to come back and make it a good patch. But we can't get under the street. And it's not the damage caused, and what the findings made by the city council, which are, again, uncontroverted here in all of these studies, there is an inherent loss of effective life of the street caused by even the best patch. And it is this dirt that sloughs into it. And there's no way to inspect for that. You can't get under the street and look at the dirt. So why isn't it covered by the damage clause in the franchise agreement? The franchise agreement says that the grantee agrees to pay to the city on demand the cost of all repairs to public property made necessary by operations of the grantee. Well, in fact, we've argued that, Your Honor, that rather than do it on a case-by-case basis, what we've done is done a study that says here is a sliding scale based on the size of your trench, the age of the street, whether you're trenching into asphalt versus concrete, and all those issues taken into account. Here's a study. Here's the number. And we argued to the district court that that section, in addition to Section 8A, but that section that you just read, is the section which provides the city with the right to charge this fee. But certainly the gas company was aware in 1938 when they received this franchise that the city would be knocking on their door and saying, if there was any problem with our pristine street done because of your trench, we're going to look to you rather than look to the public. Yeah, maybe it will be that the damage you seek are already contemplated by the contract. But you did something different here. You imposed an ordinance on top of that that required prepayment of the damage. Well, it's sometimes, and, Your Honor, That's not contemplated by the contract. Well, Your Honor, the ordinance applies to everyone, and everyone in the city who does trenching. Not everyone in the city who does trenching has a franchise. That's a very small group. Most people in the city who do trenching, the telecommunications industry, is not around after the fact. They're not there to say, oh, by the way, now it's time to pay this fee. So I think the city, by adopting, I think the city can't be criticized for adopting a fee system, a legislatively adopted uniform fee system rather than a case-by-case basis under Section 10, because that allows not just Well, sure, but then as to the people with whom you already have an agreement, you have to look to the terms of that agreement first, don't you? Well, Your Honor, we do, and in fact the city believes it is looking to the terms of the agreement, Section 10 and Section 9 and Section 8A, all of which put the gas company, a heavily regulated business which has signed a franchise, in the position of saying the city will be knocking on your door in the future, and you accept that likelihood. You accept that capability of the city in receiving this franchise. And that is, and cases are as long as my arm, that those are, that the city reserves that power, and that power has to be, the government has to be able to have that power. I also wanted to point out, Your Honor, that the cases cited by the gas company in general are not cases where the argument is that the city has contracted away its police power. The court in the U.S. Trust at page 20 said that's, the police power and the power of government domain are the ones least liked. Almost never can cities government, can government contract that away. This court's Cayetano decision did not involve the police power. It involved collective bargaining. The city, the government's ability to collect a bargain. Can you contract away your right to set terms and conditions between an employer and employee? Of course this court held. All of these other cases, U.S. Trust was a case about a debt. Can the government contract away its right to say, you know what, we don't owe you that money back? Yes, of course the government contracted away. But in terms of the police power, in terms of cases where this court, or the United States Supreme Court, has held a contracting away of the police power, the only case that I could find, Your Honor, was the Allied Structural Steel case, which is between in time, U.S. Trust and Energy Reserve, in which Energy Reserve distinguishes. In that case, the state of Minnesota changed the pension vesting time. But they changed it retroactively, Your Honor, and they only changed it for people who were leaving the state. And that's probably a police power regulation, because it's hard to call it something else. But it's not a police power regulation like this. It's changing the relationship between an employer and employee. And the Supreme Court in that case found it was, probably could have just found the statute invalid. But rather than find the statute invalid, said, well, we'll just find the violation of the contract clause as to everyone to whom it applies, which are those people who pulled out of the state who had pension plans. And this is not that case. This is not retroactive. This is not applying to a, not just pure a social or great economic ill, but just against one class of people that the state dislikes. This is something, the city has applied this to all utilities, everyone that cuts into the street, including itself. And I guess, excuse me, I should reserve time for questions. Roberts. We'll hear from the gas company, and you can save your time for a follow-up. May it please the Court. David Battaglia, Gibson Gun and Crutcher, on behalf of the plaintiff, Southern California Gas Company. I must profess I don't have a great deal to add to the lower court's well-reasoned decision and to the papers that we submitted here. I did want to address two arguments which were raised by the city. First, the reservation of rights provision. The city seems to be arguing that simply because there was Section 8A of the agreement which reserved to the city a police power to enact subsequent ordinances, that it therefore had the right to unilaterally alter the material terms of the agreement. The fact that this contract provision exists, of course, is redundant because the city may not bargain away its police power. But the fact that the city has a right to act pursuant to its police power, as held by U.S. trust, that's the holding in U.S. trust, does not mean that it has the right to unilaterally change or renegotiate material terms of a contract. In U.S. trust, the statute was enacted pursuant to the police power, but it is still a violation of the contract clause. The city's argument attempts to read the franchise in a way that reserves to the city of Santa Ana the right to change the contract at its will. And I submit that that is not only absurd, as U.S. trust states, but it also is also dangerous to cities and municipalities to be in a position where the other side knows at the time you're contracting that you can change the contract at will. What third party in that circumstance would not hesitate to enter into a contract with a city or municipality, knowing that the financial terms of the agreement or other material terms of the contract could be changed? This argument has been addressed before, and it's been addressed by the Ninth Circuit, and it's been rejected by the Ninth Circuit in two decisions. The Continental Illinois Bank decision, where the court provided that, where the statute provided that all provisions of law as now or hereafter in effect relating to revenue bonds shall apply, and the State sought to defend a subsequent initiative which altered previous promises made to bondholders. The Ninth Circuit in that situation rejected the argument that this reservation of power permitted the modification of the State's prior contractual commitments, stating that a promise in a contract that gives one party the power to deny or change the effect of the promise is an absurdity and relying upon U.S. trust company, cited by the city here today. The second decision was the Air Cal versus San Francisco decision, where there was an express reservation of rights clause in a lease agreement similar to that provided here. And the court rejected the ability of the city to argue that that reservation of rights clause allowed the city to unilaterally change the agreements it had with the city. Given those decisions, Your Honor, I don't think that the reservation of rights clause argument, the fact that the State has a police power, means that the city can unilaterally alter the terms of its agreement. And I think that is in contrast to the decision of U.S. trust and the decisions of this Ninth Circuit and even the pre-Lochner cases that we cited at length in our papers, the Boise decision. The second point that I wanted to make was there was citation in the reply brief to the first time to something called the unmistakability doctrine and to the Winstar case. And I want to object, first of all, procedurally, to raising that argument at this stage of the proceedings, not just because reading Winstar is enough to give anybody a tremendous headache in dealing with that split decision, but because the argument was not raised at all before the district court, nor was Winstar ever cited to the district court. And as this panel is aware, in Knotts v. McDonald's Corporation, legal arguments are waived, were not being raised below. But you don't think the city was acting in its private capacity when it was contracting back in 1938? Right? The city was acting in a capacity to, as a city, to negotiate an agreement that affected the rights to build an infrastructure, right? Right. It wasn't acting in its capacity as a landowner or owner of the rights. It was not acting in its private capacity. Somewhere beside the point anyway, probably. And the holding of the Winstar case, I might add, addressing the substance, is that a contract by the Federal Government was not barred, that the implication of a term directly into the contract was not prevented by the unmistakability in that context. And the Court there said something that I think is very telling for purposes of this opinion. Injecting the opportunity for unmistakability litigation into every common contract action would, however, produce the untoward result of compromising the government's practical capacity to make contracts, which we have held to be of the essence of sovereignty itself. I submit, based on the record before this Court, the fact that the city admits that acknowledges that high-quality patching may reduce the structural damages caused by utility cuts, and yet imposes upon the gas company a fee in advance for hypothetical future repairs to excavate in the city streets without a showing of actual damage, and without a showing that the gas company failed to fulfill its repair obligations in the contract, violates or impairs the contract between the parties, is a substantial impairment, and there's been no showing that the government, the city in this case, has met its heavy burden that such an impairment was reasonable and necessary in the circumstances. Do you think there's enough in the record that there's a tribal issue of fact on the last question, in other words, assuming that the Contracts Clause applies to this, that the studies provide enough of a record to, that the city can create a genuine substantial material fact on the reasonable and necessary provision? I do not. And the reason for that is that I believe there is enough in this particular record. I don't believe that the city's argument in that respect holds water. And the reason is that an impairment is not deemed necessary as a matter of law. It is an evident and more moderate course of action. And an evident or more moderate course of action in this case does not mean that the statute is tested because there's a reason for it. The city's argument is that the statute is reasonable and necessary because we did studies, the city council considered those particular studies, but it's the impairment that has to be tested against challenge. The question is whether the impairment is reasonable or necessary in the circumstances, not whether the statute has a reason behind it. No. But I think their argument would be on that is that the studies would indicate, if you follow them through, that there are costs which might be accessible and calculated on a reasonable engineering basis, and they are X. And therefore, these are the reasonable and necessary costs associated with the statute. Well, looking at first the necessary element, is there a more moderate course of action here? Is there a more moderate course of action to raise money in these circumstances? Well, yes. There's you can lower expenses. You can pass municipal bonds. No case in the last 35 years in the Ninth Circuit or the Supreme Court has ever held that alteration of a financial term of a contract means that you, therefore, can unilaterally change the terms of an agreement. Is it the most moderate course and the least restrictive remedy to attempt a repair of the streets? And I think the answer to that is no, because specific provisions already exist in the franchise which explicitly provide for repair of the streets if excavated by the gas company and a mechanism by which those repairs are going to occur. And the city expressly acknowledges in both its brief to this Court and before the lower court that high-quality patching reduces the damages. And so in that situation, the gas company has to be permitted to attempt to repair the street, respond to a demand, and then sit down with the city and address any concerns. It's undisputed from the record below that there has never been any demand on the city or any complaint that any repair by the gas company did not meet the requirements of the city. The city has never complained about any particular demand other than passing this specific contract. With regard to the reasonableness requirement, again, I think that reasonableness is tested by whether or not at the time the contractual obligation was incurred there were an anticipation that damage to the streets can be done. And as Judge Paez points out, at the time that the agreement was put into effect, the franchise had specific sections regarding the manner and supervision of street repairs by the gas company, therefore anticipating that excavations could damage the streets. It also goes further and talks about damage to the foundation of the streets. The city concedes to this Court in its brief at page 19 of 7 that it knew that trench cuts damaged the foundation of the pavement in 1938. And the question then becomes what U.S. Trust referred to as a question or change of degree and not of kind. The city's argument is that they now have more support from a Ph.D. 30 years later after an established course of conduct that says that in certain circumstances where there's not a high-quality patching, the foundation of the street could be impaired to a greater degree than they expected. And U.S. Trust says that is not sufficient to satisfy the reasonableness requirement of to prevent a substantial impairment in a circumstance where the city is trying to impair its own contract and therefore bears a heavy burden in that respect. Any further questions from the panel? Thank you for your argument. Thank you very much. It's always nice to hear Winstar argued along with Lochner. If you bring up the rule against perpetuities, we'll have a legal trifecta. I'll do my best to remind you. Yeah, there you go. Just a few items, Your Honor. First, there is a – I want to make clear that we are – that these different statutes which are being reviewed in these different cases are not all adopted under police power. The Gas Company Council said United States Trust was a statute adopted under police power. It's not. United States Trust was a statute adopted by two states to bond for bridges and tunnels and capital projects. And in that statute, they said because it's going to be paid back by tolls, we're going to take a year's worth of the money to pay the bond. What the bondholders owed in one year, put that in a reserve fund. That's not a police power regulation. That's a bond. That's a financial. That's a debt they were taking on. And then what they did later is they said you don't want that reserve fund. We want it. So even though you bondholders bought these bonds because you had this reserve fund, we're taking it back. That's not a police power regulation. North Continental Illinois, this court's decision in 1982, a police power regulation. That was a popular initiative, saved Washington from bankruptcy. People put that on the ballot and voted on that because they were upset that whoops, the Washington Power Satellite System, the nuclear power business in Washington, whoops, had contracts with the state that whoops was getting paid back from some bonds they had. And the citizens said, gee, we want to mess with these people that hold the nuclear power folks. Nothing in there is police power. There's no regulation involved. This is regulation. This counsel for, oh, I'm sorry, the third one, Air Cal, is the third case that was mentioned. This court's opinion in Air Cal. And counsel said that had an express reservation of rights. Your Honor, the reservation of rights in Air Cal said the city and county of except as to items that are in this franchise. The city's objection in this case is that the trial court, gas company, wants to write in an exception to Section 8A that doesn't exist in Section 8A. Air Cal, that exception existed. And talk about that presumably was a negotiated franchise agreement. It was an agreement for people to run businesses at the San Francisco International Airport. Presumably negotiated. This agreement, there's no evidence this agreement was a negotiated agreement. It's a Franchise Act. It was adopted by the State of California in 1937. It says what the franchise will say. It says this is what the franchise, every franchise must have these items in it. The franchise that was attached to Appellee's Brief in this case is a form in which someone has typed the word Santa Ana. It hardly speaks to a negotiated agreement. It's a grant of a property right. Moving on, I'm. And if so, I suppose they have the regulatory taking argument that we have to consider. Well, Your Honor, that's the trial court, the city moved to dismiss that. That should be first brought in State court because it has to be right. Exhausted there, yeah. Under the Supreme Court's ruling, it has to be right. The trial court did not rule upon that because of its ruling on the contracts clause. We would expect for this court to reverse, to go back, get a ruling from the trial court, and that case might go on to State court. But I can tell you, Your Honor, it's not a taking because it doesn't meet the test. It doesn't deprive them of all economic use. We didn't say you can't lay pipes anymore in the city. We said there is a regulation which will cost you a little bit more than it used to cost you to lay pipes in the city. And that little bit more is not a taking and is something which being a heavily regulated industry under the contract clause, they anticipate could happen and will happen during the course of this indeterminate franchise. Very quickly, Your Honor, I pulled footnote 7 at page 17. I can't find any admission in that on the part of the city that we knew in 1937. Instead it ends, the gas company can't be heard to argue the contrary, that the section that the franchise is a bar against future regulation. I don't see it. There was discussion at the trial court. The trial court, there is a provision in section 9 that says that boring, tunneling is the preferred method of laying pipes for the franchisee. I'm sure in 1937 that may have been economically practical to bore under city streets. But the court misplaced a comma here on the trial court. I'm sorry, Your Honor. And there is simply no, the city does not, and the findings are uncontroverted here in the city ordinance, that the city did not know of this in 1937. The city has never agreed that they were aware of this in 1937, nor are they aware of it today. And then, Your Honor, I'll finish by saying several times counsel stated that high quality patching, there's some concession that high quality patching can reduce. The sentence actually says high quality patching cannot eliminate the damage, the extra cost that this ordinance is designed to relieve the burden on the public for. So it can't eliminate that. We assume that everyone's going to, in setting this fee, we assume that high quality trenching will be done, high quality patching, excuse me, Your Honor. That's what we inspect for and that's what we insist on. The gas company does it, but that doesn't relieve them of their responsibility to comply with future regulations. Whether that regulation says you have to submit a traffic plan, that regulation says you have to pay a regulatory fee that is cheaper than you repaid in the entire street from curb to curb. Thank you. Thank you, Your Honor. Thanks. Thanks to both of you for a good, excellent presentations and briefing and we'll take
judges: Hall, Thomas, Paez